*424 Gary D. Witt, Judge,
Concurring
I concur with the Majority opinion in its holding that there was no prejudice in this case so as to warrant reversal. I further fully concur in the Majority opinion’s assertion that the admission of the HGN test results in this case was error. I write separately, however, because the error in admitting the HGN test results in Browning’s case sharply illustrates rampant misunderstanding and weaknesses in the administration of the HGN test, calling into serious question the reliability of the results when not properly administered.
Additional Factual History
Browning raised the issue of the improper admission of the field sobriety tests, including the HGN, in a motion to suppress. At the suppression hearing, Sgt. Kantola, the arresting officer, indicated that he had been an officer for eighteen years and had worked for the Kearney Police Department for ten years. In 1993, he completed the course through the National Highway Traffic Safety Administration (“NHTSA”). Sgt. Kantola also completed the following training: advanced DWI detection in 1996; drug recognition expert “preschool” and drug recognition expert school, both in 2004; drug recognition expert recertification in 2005; drug expert recertification in March 2007. Then, after Browning’s April 2007 arrest and shortly before the hearing on the motion to suppress, in 2008, Sgt. Kantola completed another recertification. In spite of attending all of this training, it became clear throughout his testimony that Sgt. Kantola had very little grasp of the proper way to administer and score the field sobriety tests.
Sgt. Kantola testified that he understood that if any element of the standardized field sobriety test is changed, the validity of results is compromised. As mentioned in the Majority Opinion and as explained more below, one of the standardized field sobriety tests is the HGN. Sgt. Kantola understood that if a test is not administered in compliance with NHTSA guidelines, the results may be inaccurate. However, he acknowledged at the suppression hearing that he had never bothered to even read the NHTSA manual, which was admitted into evidence and which was the source of his training.
“DWI Detection & Standardized Field Sobriety Testing” Manual
As the Majority Opinion points out, in order for the HGN test to be admissible in court, (1) the officer must be properly trained and (2) the test must be properly administered. State v. Hill, 865 S.W.2d 702, 704 (Mo.App.W.D.1993) (overruled on other grounds by State v. Carson, 941 S.W.2d 518 (Mo. banc 1997)). The full title of the NHTSA manual that Sgt. Kantola admitted never reading is the “DWI (Driving While Intoxicated) Detection & Standardized Field Sobriety Testing” Manual (“NHTSA manual” or the “manual”). It is a product of the International Association of Chiefs of Police (“IACP”) and the NHTSA and is published by the U.S. Department of Transportation. Since the mid-1970s, the NHTSA, with the help of the law enforcement community (including the IACP), has conducted extensive research, resulting in the development of a battery of three standardized field sobriety tests to assist officers in detecting impaired drivers. DWI (Driving While Intoxicated) Detection & Standardized Field Sobriety Testing app. § B (2006 ed.). Those tests are the HGN, the walk- and-turn, and the one-leg stand. Together, the three tests are known as the Standardized Field Sobriety Tests (“SFSTs”). In 1992, the NHTSA and IACP, in conjunction with police officers, instructors, curriculum specialists, and training administrators from several states reached a *425 consensus on minimum standards for the conduct of the three SFSTs. Id. Training on how to properly conduct the tests is included in the NHTSA course, DWI Detection and Standardized Field Sobriety Testing. Id.
The manual emphasizes the necessity of teaching officers everything in the manual:
All of the training objectives are considered appropriate and essential for police officers who wish to become proficient at detecting evidence of DWI and at describing that evidence in written reports and verbal testimony. All of the subject matter is considered necessary to achieve those objectives. All of the learning activities are necessary to ensure that the participants master the subject matter.
Mat 7 (Introductory material).
The manual also notes that the “course is ‘flexible’ in that it can easily be expanded since it does not cover all dimensions of DWI enforcement.” Id. The manual also states that “It is critical to note that the purpose of this training is to ensure that participants become proficient in administering and interpreting standardized field sobriety tests.” Id.
The core curriculum consists of sixteen sessions that span twenty-two hours and forty-five minutes over three to five days. Id. at 5-6. At the end of the training, a written examination over the SFSTs is administered, and participants must receive a grade of eighty percent or higher on the written examination to “successfully complete the training.” Id. at 15. In addition, participants also must demonstrate proficiency in administering and interpreting the SFSTs, which includes administering the complete test battery at least once, in an instructor’s presence, without deleting or erroneously performing any of the critical administrative elements of the tests before the participants are deemed to have successfully completed the training.[1] Id. The three SFSTs are the only scientifically validated and reliable field sobriety tests. Id. at app. § A-5; § VIII-4.
HGN Testing
Sgt. Kantola’s misunderstanding of the HGN test, the only exclusively scientific test of the three in the battery, illustrates why it is perhaps the least understood of the field sobriety tests. By way of overview, “[njystagmus is the involuntary jerking of the eyes.” Hill, 865 S.W.2d at 704. Under the HGN test, a person’s eye movements are tested as a means of determining whether he or she is under the influence of alcohol. Id. When administered properly by someone with sufficient training, the HGN test has been deemed scientifically reliable under the Frye[2] test. Hill, 865 S.W.2d at 704.
While Hill set forth the basic elements of the test, I write separately to set forth the scientific requirements for the proper1 administration of the HGN test and the pitfalls of its improper administration. Hill, 865 S.W.2d at 704.
According to the NHTSA manual, the involuntary jerking of nystagmus occurs as the eyes gaze to the side. DWI (Driving While Intoxicated) Detection & Standardized Field Sobriety Testing § VIII-5. In addition to being involuntary, the person is generally unaware that it is happening and *426 is powerless to stop it or control it. Id. Alcohol and certain other drugs cause HGN. Id.
Independent of alcohol and other drugs, the manual addresses other circumstances under which the eyes will jerk involuntarily and can impact the reliability of this field sobriety test. There are three general categories of nystagmus: vestibular, neural, and pathological. Id. at § VIII-6 — VIII-11. Vestibular nystagmus is caused by movement or action in the vestibular system, which is a sense located in the inner ear that provides information to the brain and consequently to the eyes about position and movement of the head to maintain orientation and balance of the body.[3] Id. Neural activity can result in nystagmus; HGN is included in this eate-gory.[4] Id. Nystagmus also can be caused by certain pathological disorders, which include brain tumors and other brain damage or some diseases of the inner ear.[5] Id.
The manual instructs an officer on what to observe in assessing possible medical *427 impairment, including pupil size, resting nystagmus, and tracking ability. Id. at § VIII-11. Pupil size will be affected by some medical conditions or injuries. Id. If the two pupils are “distinctly different” in size, the subject may have a prosthetic eye or suffer from a head injury or neurological disorder. Id. A subject may have resting nystagmus, which is jerking as the eyes look straight ahead. Id. It is an infrequent condition and usually indicates “a pathology” or high doses of a drug such as a Dissociative Anesthetic like PCP. Id. The person administering the test is to check for “tracking ability,” which will be affected by certain medical conditions or injuries involving the brain. Id. at § VIII-12. If the two eyes do not track together, the possibility of a serious medical condition or injury is present. Id. Passing a stimulus[6] across both eyes is how to check for this. Id. If the eyes do not track (i.e., if one eye tracks the stimulus but the other fails to move or lags behind the stimulus), there is a possibility of a neurological disorder. Id. If a person has sight in both eyes, but the eyes do not track together, there is also a possibility that the person is suffering from an injury or illness affecting the brain. Id.
After the section on “medical impairment,” the manual lists ten steps in administering the HGN test, followed by “three clues” with lengthy descriptions, and then instructions on administering the Vertical Gaze Nystagmus (“VGN”), which is the tenth step of the HGN test. Here is a summary of the ten steps for properly administering the HGN test:
Step I: Check for Eyeglasses. Eyeglasses may impede the suspect’s peripheral vision and may impede the officer’s ability to observe the eye carefully. It does not matter whether the suspect can see the stimulus with “perfect clarity” as long as the suspect can see the stimulus at all because nystagmus is not a vision test. Id. at § VIII-13.
Step II: Verbal Instructions. The officer is to give the suspect verbal instructions that include the following: a) put feet together, hands at side; b) keep head still; c) look at the stimulus; d) follow the movement of the stimulus with the eyes only; e) keep looking at the stimulus until told the test is over. These are the major points that “must be” conveyed. It is important that the subject keeps the head still and follows the stimulus with the eyes alone. Id.
Step III: Positioning the Stimulus. The officer is to position the stimulus approximately twelve to fifteen inches in front of the suspect’s nose and slightly above eye level. The stimulus should be in this position for each of the steps of the HGN test. Maintaining the stimulus slightly above eye level keeps the eyes open wide so the clues can be seen more easily. Id. at § VIII-14, § VIII-17.
Step IV: Equal Pupil Size and Resting Nystagmus. The officer is to check for both of these factors. At this point resting nystagmus or unequal-pupil size may be observed and the officer should note any display of resting nystagmus or unequal pupil size. These are not clues of intoxication, but are indicators of an injury or other physical condition which may call into question whether the HGN test should be administered to this subject. Id. at § VIII-12, § VIII-14.
Step V: Tracking. The officer is next to check for equal tracking. He or she should move the stimulus from center to *428 far right, to far left, and back to' center (approximately two seconds). Both eyes should track, the stimulus at an equal rate. Once again the lack of equal tracking is not a clue of intoxication, but may call into question whether the HGN test should be administered to this subject. Id.
Step VI: Lack of Smooth Pursuit. The officer is next to check the left eye for lack of the “smooth pursuit” clue. The stimulus should be moved from the center all the way out to the right as a steady speed that takes approximately two seconds. Then the stimulus should be moved back to the center maintaining a steady speed of approximately two seconds. The eye should be moved out as far as it will go to the side. If the eye is observed to jerk while moving,[7] that is one clue. The officer should next check the right eye in the same fashion, moving the stimulus from center all the way to the left. This is to be repeated for each eye and compared. The officer is to make at least two complete passes in front of the each eye to check this clue. If the jerking is observed in both eyes, this is two clues. Common mistakes are holding the stimulus too close or too far from the eye, moving the stimulus too slowly or too quickly, failing to move the stimulus far enough to the side to take the eye to maximum deviation and curving downward or around with the stimulus. Id. at § VTII-14, § VIII-20— VII-21.
Step VII: Distinct and Sustained Nys-tagmus at Maximum Deviation. The officer is next to check the left eye for distinct and sustained nystagmus at maximum deviation and then repeat with the right eye and compare. Once again, the stimulus should start at the center and then move to the side until no white is showing in the corner' of the eye. The stimulus should be held out at the side for a minimum of four seconds. The nystag-mus or jerking must be “definite, distinct and sustained in order to score this clue.” If the jerkiness is distinct and sustained for a minimum of four seconds in the left eye, that is one clue. The officer is to check each eye “at least twice” for this clue. If there is only slight nystagmus or if it is not sustained for at least four seconds, this clue is not present and cannot be counted. Common mistakes in judging this clue are failure to bring the eye to maximum deviation (no white showing) and failure to hold the stimulus steady for at least four seconds once maximum deviation is reached. If a subject’s eye is held at maximum deviation for more than thirty seconds, then fatigue nystagmus may begin. Fatigue nystagmus is not a clue of impairment. Id. at § VIII-14— § VIII-15, § VIII-22 — VIII-25.
Step VIII: Onset of Nystagmus Prior to 45 Degree. The officer is to check the left eye for the “onset of nystagmus prior to 45 degree” clue and then repeat for with the right eye and compare. The officer is to hold the stimulus at center and slowly and steadily move it toward the side. It should take about four seconds to move the stimulus from center to the edge of the subject’s shoulder. This must be done slowly to detect thevactual point of onset of nystagmus. If the jerking begins and continues prior to forty-five degrees, that is one clue. When the jerking is observed, the officer is to stop the stimulus at that point to see if the jerking continues. If the jerking is not clearly evident when the stimulus is held steady, the point of onset has not been properly detected. If the jerking stops when the stimulus stops, the *429 officer is to continue moving the stimulus to the side until the jerking begins again. Once the point of onset is properly found, it is then necessary to determine if that point is before forty-five degrees. Forty-five degrees can be difficult to ascertain. There should be some white still showing at the corner of the eye and the stimulus should be approximately even with or slightly beyond the edge of the subjects shoulder. If nystagmus does not start before forty-five degrees or if it fails to continue jerking when the stimulus is stopped, this clue is not present. Again, each eye is to be checked at least twice for this clue. Common mistakes include failing to check for white in the corner of the eye once the point of onset is determined, failure to check the alignment with the subjects shoulder once the point of onset is determined, and tending to stop short of forty-five degrees. Id. at § VIII-15, § VIII-26 — VIII-30.
Step IX: Total the clues. Three is the maximum number of clues possible for each eye, such that six is the total maximum number of clues possible for both eyes. A suspect’s performance may not be “exactly identical” in both eyes. Id. at § VIII-15. “As BAC increases, many people first show inability of smooth pursuit, then show distinct jerkiness at maximum deviation, and finally show an onset within 45 degrees.” Id. “However, that may not be true in all cases: the clues may develop in virtually any sequence, in any particular suspect.” Id. A total of four out of the possible six clues is an indicator of intoxication. Id. at § VIII-83. “It is possible that all three clues definitely will be found in one eye, while only two (or sometimes only one) will show up in the other eye. It is always necessary to check both eyes, and to check them independently.” Id. at § VIII-15. “It is unlikely that someone under the influence of alcohol will behave totally different [sic]. Thus, if one eye shows all three clues distinctly while the other eye gives no evidence of nystag-mus, the person may be suffering from one of the pathological disorders covered previously.” Id. at § VIII-16. The HGN test should never be used to give an opinion as to a specific BAC level. Id. at § VIII-25.
Step X: Check for Vertical Gaze Nys-tagmus.
Although VGN was not examined in the research that led to the SFSTs and the results are not included in the score for the HGN test, testing for VGN is the final step in administering the HGN test. The officer is to start with the stimulus in the same position set forth above and raise it until the subject’s eyes are elevated as far as possible without moving the head. Then the officer is to hold the stimulus in that position for approximately four seconds. Next, the officer is to watch for jerking at maximum elevation. For VGN to be recorded, it “must be definite, distinct and sustained for a minimum of four seconds at maximum elevation.” Id. at § VIII-15 — § VIII-16.
The presence of HGN can indicate use of certain other drugs besides alcohol, including depressants, inhalants. Id. at § VIII-16. VGN can be associated with high doses of alcohol and certain other drugs. Id. at § VIII-85. If VGN is present and HGN is not present, it could be a medical condition and not a sign of alcohol or drug impairment. Id. at § VIII-10.
[[Image here]]
I fully concur with the Majority Opinion that the holding in State v. Burks, 373 S.W.3d 1, 6-7 (Mo.App.S.D.2012) is questionable and should not be followed. If not properly administered, the HGN test loses its scientific reliability and becomes irrelevant to the issues before the court.
*430 Because of Sgt. Kantola’s failure to properly administer the HGN test, the State failed to lay a proper foundation, and this' evidence should have been excluded.
However, because Browning did not establish prejudice, I concur with the result reached by the Majority.

. Merely showing that the person giving the test has attended a certain number of hours of training is insufficient to establish that the person is "properly trained.” There must be evidence that the person attended the training and passed the written and practical application examinations at the end of the training.

. Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923).

. There are four types of vestibular nystagmus described in the manual: (1) Rotational, which occurs when a person is spun around or rotated rapidly, causing the fluid in the inner ear to be disturbed. (2) Post rotational, which occurs when the person stops spinning such that the fluid in the inner ear remains disturbed for a short period of time and the eyes continue to jerk. (3) Caloric, which occurs when fluid motion in the canals of the vestibular system is stimulated by temperature as by putting warm water in one ear and cold in the other. (4) Positional alcohol (PAN), which occurs when there is a foreign fluid, such as alcohol, that alters the specific gravity of the blood in unequal concentrations in the blood and vestibular system. This type causes the vestibular system to respond to gravity in certain positions, resulting in nys-tagmus. There are two subsets of PAN. PAN 1 occurs when the alcohol concentration in the blood is greater than the inner ear fluid and occurs when the blood-alcohol content is increasing, and PAN-2 occurs when the alcohol concentration in the inner ear fluid is greater than in the blood. An example of PAN-2 is the spinning of the room when a person lies down after consuming alcohol, which occurs while the blood-alcohol level is decreasing. Id. at § VIII-6.

. There are multiple types of neural activity that the manual states can cause nystagmus. (1) Optokinetic nystagmus, which occurs when the eyes fixate on an object that suddenly moves out of sight or when the eyes watch sharply contrasting moving images. Examples of optokinetic nystagmus include watching strobe lights, rotating lights, or rapidly moving traffic in close proximity, but the HGN test will not be influenced by the optoki-netic nystagmus if administered properly. (2) Physiological nystagmus is a natural nystag-mus that keeps the sensory cells of the eye from tiring. This is the most common type of nystagmus. It happens to all of us, all of the time, and it produces extremely minor tremors and jerks that are generally too small to be seen with the naked eye. (3) Gaze is listed in the manual as a third type of nystagmus under neural activity. The manual says there are multiple types of gaze nystagmus: a) horizontal gaze (HGN), which is the main type tested for in field sobriety testing, and b) vertical gaze. Horizontal gaze is the meat of the training course, and the manual states that it "is the observation of the eyes for Horizontal Gaze Nystagmus that provides the first and most valid test in the standardized field sobriety testing battery.” The presence of HGN can indicate use of certain other drugs, including depressants, inhalants, "October 14,” Dissociative Anesthetics such as PCP and its analogs. Vertical gaze (VGN) is an involuntary jerking of the eyes (up and down) occurring as the eyes are held at maximum elevation. VGN can be associated with high doses of alcohol 'and certain other drugs. The drugs that cause VGN are the same ones that cause HGN. There is no drug that will cause VGN that does not cause HGN. If VGN is present and HGN is not present, it could be a medical condition. For VGN to be recorded, it "must be definite, distinct and sustained for a minimum of four seconds at maximum elevation.” Id. at § VIII-8 — VIII-11.

.The nystagmus caused by pathological disorders is extremely rare in the driving population, and persons suffering from these disorders are rarely able to drive. Id. at § VIII-11.

. The stimulus may be the eraser on a pencil, the tip of a penlight, the tip of a finger or other small object. VIII-17. It is best to use a stimulus that contrasts with the background. Id.

. This jerking is described as a marble rolling across sandpaper or a windshield wiper bouncing on a dry window. An unimpaired subject’s eye will move like a marble rolling across a smooth polished surface.